1810.

Lessee of<br>DUNLOP<br><i>v.</i><br>SPEER.

Motion refused,

---

Lessee of BONNET *against* DEVEBAUGH and SMITH.

*Chambersburg,*<br>*Saturday,*<br>October 6.

THIS cause was tried before the Chief Justice, at a Circuit Court for *Bedford* county in *October* 1808; and now came before the court, upon an appeal from his decision.

The declarations of a deputy surveyor, that he had made a certain survey under an order from the proprietaries, are not evidence, al-

By the report of the Chief Justice, the evidence, so far as is necessary to understand the decision, was as follows:

though he was dead before the trial, and all his official papers had been accidentally burnt, and although in addition to these circumstances, the warrant of acceptance recited that the survey had been made under such an order.

Though such a recital is good evidence against the proprietary, it is not evidence against third persons claiming adversely to the survey, by a title commenced before the return of survey.

Title by settlement and improvement, though at different times it has been in some measure shaken, is now as well established as any species of title in *Pennsylvania*; and very often has been preferred to warrant and survey and patent.

General history of improvements given.

1810.

Lessee of
BONNET
v.
DEVEBAUGH.

The plaintiff claimed title under a survey made for *George Croghan* in 1755, which was not returned to the office of the surveyor-general till the year 1763. On the return of the survey in that year, a warrant of acceptance was issued, in which it was *recited, that a survey had been made in the year 1755, by John Armstrong, deputy surveyor, by virtue of an order from the proprietaries;* and on the 28th of *May* 1763 a patent issued to *George Croghan.*

About the year 1755 a war broke out between the *French* and *Indians* on one side, and *Great Britain* and her then colonies on the other; in consequence of which the settlements in that part of the country where the land in controversy lies, were broken up; and this war continued with little intermission till after the time of issuing the patent to *George Croghan.*

In the year 1763 the office of *John Armstrong,* and all his official papers, were accidentally consumed by fire.

The plaintiff produced no warrant, prior to *Croghan's* survey in 1755; but he offered to prove by the deposition of *William Lyon,* that the said *Lyon* had heard *John Armstrong* (since deceased) declare, that before the said survey was made by him, he had received a letter from the proprietary officers at *Philadelphia,* ordering him to make surveys for *George Croghan,* in the *Raystown* settlement, (where the land in dispute lies) or wherever else the said *Croghan* should direct. To this evidence the counsel for the defendant objected. The Chief Justice observed that it was a singular case. That in general the declarations of a deceased person were not evidence; but considering that *Armstrong* had been a public officer, that his official papers had been burnt, and the return of survey had been accepted in the land office, he thought it best to admit the evidence, reserving the point however for the opinion of the Supreme Court, as it was one on which many titles might depend, and seemed worthy of fuller investigation and reflection than it could receive during the trial.

The defendants claimed under, and gave evidence of an improvement right, commenced, as they alleged, by *Thomas Croyle* in the year 1754, and continued with as much perseverance as the war and other circumstances would admit.

On the 10th *June* 1762, a warrant issued to *T. Croyle* for "100 acres adjoining lands surveyed to *George Croghan*, "and including the said *Croyle's* improvement at the mouth "of the *Snake Spring*." On the 4th of *March* 1768 a survey was made for *T. Croyle* on the said warrant, containing 123 acres and some perches, which did not include the land in dispute; but although that survey did not cover the land in dispute, yet *Croyle* continued to live on the land in dispute, which adjoined the survey; and the defendants gave in evidence the deposition of *Adam Croyle*, son of the said *Thomas*, who swore that he was sent when a young man under age, in the year 1762, by his father, to take out a warrant from the land office for 300 acres; and that when he applied for the said warrant, he was prevented from obtaining it by *George Armstrong* and one *Richard Tea*, through whom the plaintiff derives his title, and who was then a deputy officer in the service of the proprietaries. That the said *Armstrong* and *Tea* alleged that the land had been surveyed for *Croghan*, and in consequence of their opposition, the said *Adam Croyle* could obtain a warrant for no more than 100 acres, with which his father was much discontented, and said he would hold all the land, and expected to obtain justice from the proprietaries.

There was a large mass of additional testimony on both sides reported by the Chief Justice, but the points of the cause will be understood from this abstract.

His honour submitted to the jury three questions on matters of fact. 1. Whether the survey for *Croghan* in 1755 was made in pursuance of an order from the proprietaries, applying with reasonable certainty to the land in dispute. 2. Whether the settlement of *T. Croyle* was commenced prior to *Croghan's* survey; and 3. Supposing it was prior, whether the said *Croyle* had persevered in the continuance of the said settlement with reasonable diligence, making allowance for the circumstances of the war, and also kept up his claim to 300 acres attached to his settlement; or whether he had not abandoned his claim for more than 123 acres contained in his survey on the warrant for 100 acres taken out in 1762. The Chief Justice told the jury, that if they should be of opinion that *Croyle's* settlement was prior to *Croghan's* sur-

1810.

Lessee of
BONNET
*v.*
DEVEBAUGH.

vey, and that he had not relinquished his right to any part of the land to which his settlement intitled him, in such case the defendants' title was better than the plaintiff's, and the verdict ought to be in their favour. So also it ought to be in their favour, although the jury should be of opinion that the settlement was made *after Croghan's* survey but *before* the *return* of it, provided they were also of opinion, that there was no warrant or order from the proprietaries authorizing the said survey, previous to the making of it. But if they should be of opinion that the said survey was founded on an order or warrant applying with reasonable certainty to the land in dispute, and that it was executed prior to the commencement of *Croyle's* settlement, in that case the verdict should be for the plaintiff. So also it should be for the plaintiff, if the jury should be of opinion that *Croyle's* settlement was prior to *Croghan's* survey, but that *Croyle* had relinquished his right to all the land, except that which was contained in the survey made on his 100 acre warrant.

The jury found for the plaintiff, on which the defendants' counsel moved for a new trial; and this motion was immediately overruled by the Chief Justice without argument, that the cause might be brought before the Supreme Court.

The reserved point was now argued with the *motion for* a new trial by *Todd* and *Watts* for the plaintiff, and by *J. Riddle* and *Duncan* for the defendants.

YEATES J. The defendants have in this instance appealed from the decision of the Circuit Court of *Bedford* county.

It appears from the report of the case, that the plaintiff founded his pretensions to the lands in controversy, on a patent issued to *George Croghan* bearing date 30th *May* 1763, one moiety whereof became vested by divers mesne conveyances in *Jacob Bonnet*, and for which he obtained a verdict. The defendants claimed under an actual settlement and improvement, commenced (as it was said) by *Thomas Croyle* in 1753, and duly continued from time to time, unless when he was driven off by the savages.

The patent is founded on a warrant of acceptance, dated 26th *May* 1763, of a survey made by *John Armstrong* in

1755, which calls for *Thomas Croyle* on the course N. 75°
W. 320 perches. This warrant recites, that " by *our consent*
" *and direction*, there was surveyed for *George Croghan*
" by *John Armstrong* deputy surveyor, a tract of land on
" *Snake Spring* in 1753, containing 390 acres 111 perches for
" which he had agreed to pay 15*l.* 10*s.* for every hundred
" acres, and interest from 1st *March* 1755"——and requires
the surveyor general to accept the survey, and return it into
the secretary's office.

No point of law is better established, than that recitals in
a deed are evidence against the grantors, and those claiming
under them by *subsequent* conveyances, but not against the
persons holding under them by *prior* rights, *Gilb. Law. Evid.*
99. 100., 12 *Vin.* 129. 233., 1 *Dall.* 67., *Vaugh.* 74., 2 *Lev.* 108.,
1 *Salk.* 286. It clearly follows from hence, that the assertion
of the authority, under which the survey was made, either
in the warrant of acceptance or patent, does not legally
prove that authority, *as to the present defendants*, if they held
under a settlement prior thereto.

The counsel of the plaintiff, fully sensible hereof, attempted
to establish that fact by the deposition of *Wm. Lyon* esquire,
who swore, that " he heard *John Armstrong* say, that he
" had received instructions in writing from the proprietary
" agents, to survey lands *in Ray's Town Settlement, or such
" lands as* George Croghan *would shew or direct;* and that
" he thought he saw one or two such orders from the afore-
" said agents to General *Armstrong.*"

The declarations of *John Armstrong*, thus proved, were
objected to upon the trial; but the Chief Justice ruled the
same to be evidence under the peculiar circumstances of the
case, though with hesitation; and at the instance of the de-
fendants' counsel reserved the point for future discussion.
The fact was notorious, and it was admitted, that *Armstrong*
was the deputy surveyor of the district, and had been dead
some years; and that his office with all the papers therein,
were consumed by fire at *Carlisle* in 1763. It was agreed,
that *hearsay* in general is not evidence against third per-
sons; and that *pedigree* or *custom*, which form exceptions
to the general rule upon the ground of necessity, do not
come in question here. But it is attempted to distinguish

the declarations of a public officer who is dead, from those of individuals, upon local reasons.

I cannot bring my mind to assent hereto, *on principle;* and if *precedents* are to govern, I find the point has been determined in a different way. It is not disputed, that the late proprietaries, as the absolute lords of the soil, under their original chartered rights, might at their will and pleasure grant preferences to individuals, who were inclined to purchase any portion of their vacant and unappropriated lands; but having erected a land office for the sale of their lands, all persons complying with the terms held out by the rules or custom thereof, acquired a right to the proportion of land appropriated to their use, not only against other individuals, who might thereafter attempt to appropriate the same land, but even against the proprietaries themselves, unless they had previously and by some act *of notoriety*, evidenced their intention to withdraw such land from the general mass of property, and to appropriate it to individual use. 4 *Cran.* 407., *Penn's Lessee* v. *Kline.* A warrant or order of survey, some written direction or instructions from the commissioners of property, or some one of them, became necessary, to justify the surveyor-general or his deputies, in locating the land applied for, and subtracting it from the bulk of vacant soil. So far am I from subscribing to the doctrine contended for by the plaintiff, that where there is a departure from the common modes of granting lands, there should be any deviation from the established rules of evidence to meet an uncommon or unfortunate occurrence, I feel myself strongly disposed rigidly to adhere to those rules, upon grounds of extended sound policy, and of public welfare. The authority under which surveys are made, is generally to be found in the books of the land office, or at least some entry thereof. Where diligent search has been made, and no official copy of such paper or entry can be procured, after proving that such paper did once exist, an unofficial copy will be received in evidence; and where there is no copy, the contents of the warrant, order, or written direction may be shewn by parol testimony. I am ignorant of any other mode pointed out by the law, to supply the loss of an original paper.

In *Nesbitt's Lessee* v. *Karr and Rankin*, at a court of *Nisi*
*Prius* held in *Huntingdon* county in *May* 1793 before
*M'Kean* Chief Justice and myself, it was resolved, that the
declarations of the secretary of the land office, could not be
received in evidence, and had no legal operation. To admit
them, would introduce all the evils intended to be prevented
by the act of frauds and perjuries. In *Drinker's Lessee* v.
*Holliday* at *Nisi Prius* in the same county in *May* 1796,
*Shippen* justice and myself held, that the declarations of ·
the surveyor-general as to what passed at the time of the
return of a survey, could not go to the jury. His certificate
of official papers was good · evidence; but independent facts
could only be established by his oath or affirmation, as in the
case of other witnesses. And in *Steele and wife's Lessee* v.
*Findlay et al.* at a Circuit Court held in *York* county in *April*
1801, by myself and Judge *Brackenridge*, a letter from
*Wm. Peters* secretary of the land office, asserting the con-
tents of a paper which he had seen in his office executed by
the parties, was overruled in evidence. In all these different
instances, the public officer was dead, at the times of the
several trials. I might swell the list of cases determined on
this head to a much greater extent; but I apprehend, a suf-
ficient number has been cited.

It was contended by the plaintiff's counsel on the argu-
ment of the appeal, that *Armstrong and wife's Lessee* v.
*Morgan*, tried at *Huntingdon* 18th *May* 1803 before myself
and Judge *Smith*, was much like the present in principle, and
that the recitals in a warrant of acceptance were in that
case held *conclusive* on an actual settler, who occupied the
lands prior thereto. This is peremptorily denied.

The dissimilarity between the two cases will appear on a
contrast of the evidence. It appears by my notes, that in
the *Huntingdon* cause, the plaintiff's counsel, after opening,
offered in the first instance to prove, that the land office had
been searched with care, and that the smallest vestige of a
written order to *John Armstrong* to make the survey in
question could not be found. This the defendant's counsel
dispensed with; and that fact stood admitted. Two deposi-
tions of *Samuel Findlay*, an assistant of *Armstrong*, taken in

1801 and 1802, were then read in evidence. He swore, that in 1761 he saw written instructions from *Richard Peters* secretary of the land office to *John Armstrong* the deputy of the district to survey for *George Croghan* 4000 acres of land on or about *Aughwic Creek*, and that he surveyed the same accordingly in *November* 1761, agreeably to the written directions of *Croghan*, and annexed a plot to his second deposition made at the time; that one of the tracts surveyed was intended by *Croghan* for *Warder* and *Franks*, one other for *George Ross*, and the third for *John Armstrong*, which included the lands then in controversy. For the survey of this last tract a warrant of acceptance issued in favour of *Armstrong*, dated 8th *March* 1774, which stated that no warrant had previously issued. A patent granted to *James Foley* under the claim of *Warder* and *Franks*, dated 19th *October* 1773, was produced by the plaintiff, which recited, that " the three different surveys had been made for *Croghan* " *by the proprietary's consent and direction*." It was shewn in evidence, that one *John Price*, well knowing the survey which had been made for *Croghan*, had seated himself on the disputed lands in *March* 1771, cleared between thirteen and seventeen acres of land, erected a cabin and lived therein for three years; that he *verbally* sold his claim including 15 acres of grain then in the ground to *John Morgan* for 30*l.*, in the fall of 1774;—and that about this time *Findlay* informed *Morgan*, that the lands had been surveyed for *Croghan*, and gave him a copy of the draught; and that *Morgan* never claimed the land by settlement, until some supposed mistake had occurred in the returns of survey made for *Croghan*.

Upon this state of facts, it is clear, that the existence of the written order of *R. Peters* being established, and that in all probability it had been burnt with other office papers in *Armstrong's* house in 1763, it was competent to the plaintiffs (after the admitted fact, that no trace could be found of it in the land office on the most careful search) to give oral testimony of the contents of that paper, by a person who had seen and perused it. If any stress was laid by either of the members of the court on the recital in *Foley's* patent, of which I am not at present aware, it could only have been, that it corroborated the oath of *Findlay;* and this too in the

case of a squatter, who knew of the previous adverse right before he went on the land, and whose most inadequate terms of sale to the defendant's ancestor, afforded internal evidence, that he did not hold under a settlement right. Of the legal effect of a recital in a deed, I think it scarcely possible, that either of us could have entertained the smallest doubt.

The defendants' counsel have insisted in their argument, that no right could have vested in *Croghan*, until his return of survey was accepted in the office of the surveyor-general; and have compared his case to that of a shifted warrant or location, if even the written order of survey had been produced on the trial. I am not prepared at present to go to that extent. If we take it for granted, that the testimony of Mr. *Lyon* precisely agrees with the phraseology of the supposed instructions, they cannot with propriety be resembled to a removed or shifted location, adapted to other lands. The expressions " Lands in *Ray's Town Settlement*" though vague in themselves and wanting precision, may be supposed in some degree to answer the lands in question, and the survey in such case if made on vacant lands would complete the contract. The order in one respect might be assimilated to a removed location, that a person by inspecting it in the files of the office, could not tell, to what portion of specific soil the order was applicable; but this is a mischief, to which all indescriptive locations, are more or less subjected. It would seem to be rather of a *mixed* kind and not confined to a particular spot. The words used by Mr. *Lyon* are in the disjunctive. " Lands in *Ray's Town Settlement*, " *or* such lands as *George Croghan* should shew or direct." Under such an unusual species of order, I feel myself disposed to pursue a middle course; and should think, that the title would relate back to the time of survey, *provided* that the same was returned in a reasonable time under all existing circumstances, but not otherwise. Some time must necessarily elapse before a survey made at a distance can be possibly returned to the surveyor-general; and the general practice of deputy surveyors in making their returns would have much weight on my mind in a question of this nature. But I have no hesitation in saying, that a period of eight years,

1810.

Lessee of
BONNET
*v.*
DEVEBAUGH.

would be too long a term, to keep back a return of survey under such peculiar circumstances as the present, so as to postpone an adverse title intervening fairly between such survey and return.

Believing myself to be correct in the opinion I have delivered, that the deposition of *William Lyon*, so far as it contains the declarations of *Armstrong*, was objectionable, and inadmissible as evidence in the cause, I proceed to consider, whether the defendants have disclosed such merits, as intitle them to demand a new trial, in the due exercise of the legal discretion of this court. For unquestionably *Croghan* had by his patent of 30th *May* 1763, the exclusive title to these lands, if there was not at that point of time, an elder subsisting preferable claim thereto, which was recognised by the laws and usages of the state.

The defendants allege, that such prior right was vested in *Thomas Croyle*, as an actual settler, and *bona fide* improver; and that they hold under him. Now what are their proofs? On the trial, two witnesses swore to *Croyle's* having erected his cabin in the spring of 1753, three or four perches from the head of *Snake Spring*. Three witnesses attested the removal of his family thither, from *Conococheague* in the following year; and twelve witnesses gave testimony of their seeing him reside in the cabin with his family at different times between 1754 and 1763, and that he cleared land and cultivated the same. But what greatly weighs with me, is, that the very draught of survey made for *Croghan* by *George Armstrong* in 1755 designates *Thomas Croyle* on the course N. 75° W.; and my mind is abundantly satisfied on the whole, that in whatever month of that year the survey was made, *Croyle* was then actually resident on the land, and improving the same as a settler. This then was the inception of an equitable title, preceding any right of *Croghan*, which if duly followed up, would by the benevolence of the late proprietaries, and the settled usage and custom of their commissioners of property, have conferred a right of preemption to 300 acres of land. But as this imperfect right may in the first instance be built on a slight foundation, and may easily be acquired, so may it as readily be forfeited by abandonment.

It has been strongly urged by the plaintiff's counsel, that *Croyle* by his conduct has relinquished all claim of preemption to the lands in controversy, by taking out a warrant on the 10th *June* 1762 for *one hundred acres adjoining lands surveyed to George Croghan*, and including his improvement at the mouth of *Snake Spring;* upon which a survey was afterwards made on the 4th *March* 1768, of 123 acres and 123 perches by *George Woods* for *Richard Tea* deputy surveyor. It is said, that if his settlement really preceded *Croghan's* survey, and he might thereby intitle himself to 300 acres including his improvement, to be laid off in a reasonable shape, yet he was under no necessity to take so large a quantity; and consequently, that he, and those claiming under him are concluded by the lines of his survey. That his warrant expressly calls for lands adjoining *Croghan's* survey.——And this introduces the inquiry, whether *Croyle's* confining himself to the warrant for the one hundred acres, was a voluntary act on his part, or was superinduced by the insuperable necessity of the moment?

A man certainly should be bound by his own acts arising from the freedom of his will, or the uncontrolled acts of his adopted agent. *Adam Croyle*, aged about eighteen years (if he was ten years old, when he came up with the family in 1754) was sent to *Philadelphia* by his father with 5*l*. in *May* 1762, to obtain a warrant for three hundred acres of land including his improvement at the head of *Snake Spring*. It is a well known fact, that *Richard Tea* was then a clerk in the employment of the secretary of the land office; and it appears by the evidence, that *Croghan* on the 21st *December* 1763, conveyed to him the lands included in his patent in consideration of 300*l*. *Adam Croyle* testified, that on making application for the warrant according to his father's orders, he saw *George Armstrong* and *Richard Tea* in the office, who objected to his obtaining it, because the land applied for was included in one of *Croghan's* surveys;—that he applied at three different times for the 300 acres warrant, but was always opposed by *G. Armstrong* and *R. Tea*, and could not succeed in obtaining the same; and that on his return to his father, he informed him of what had passed, who thereupon replied, that he was determined to hold the land notwith-

1810.

Lessee of
BONNET
v.
DEVEBAUGH.

standing, and added, that he relied on *Penn* for justice. The truth of this relation is powerfully aided by a circumstance of which there can be no doubt. *Thomas Croyle*, notwithstanding the dereliction imputed to him, uniformly kept the possession of the land whereon he had originally improved, built, and resided until his sale to *Robert Elliot* on the 14th *April* 1774, although that portion of the land was not comprehended by his survey: and in his conveyance to *Elliot*, a covenant is inserted, that he would prove his improvement right to be prior to the right or claim of any person whatever. Judging on the whole of *Thomas Croyle's* conduct, I see no just ground to infer an abandonment of any part of his equitable interest under his ancient settlement.

It only remains for me to give my general ideas of improvement rights, their origin, and the doctrines which have obtained at different periods of time respecting them. Some remarks made during the argument impel me to this task, as a duty.

It has frequently been asserted, and considered as a kind of tradition, that the first proprietary by proclamations and advertisements dispersed in foreign countries, invited adventurers to settle on his lands, and encouraged them to emigrate by promises of waiting for the purchase money until it suited their convenience to discharge the same. In the earlier years of my practice at the bar, I endeavoured, in conjunction with the late Judge *Wilson*, to ascertain this fact; but notwithstanding all our efforts, we never found any one, who had seen such instruments, or had heard any credible person assert that he had seen them. And on carefully searching the minutes of the board of property at *Lancaster* since the argument, I can find no circumstance detailed, which would lead me to infer the fact. I allude not to the proclamation of governor *John Penn* of the 24th *February* 1763, previous to the treaty at *Fort Stanwix*. I met with one case in 1702, where a preemption right was granted to *Peter Bezalion*, a settler in 1700.

Mr. *Chew*, when Chief Justice, at *Nisi Prius* in *Carlisle* in *June* 1774 in *Campbell's Lessee* v. *Kidd*, imputed the origin of improvement rights to the uniform usages of the land

office; and asserted, that the encouragement given by the proprietaries and their officers to improvements had clearly expressed their assent to the right of preemption of settlers on vacant lands, and was such a sanction as amounted to an implied contract on the part of the proprietaries, that they would grant the lands to such persons on the usual and common terms: and should the proprietaries refuse the terms so offered to them by an improver, chancery would decree a specific performance.

In *Smith's Lessee* v. *Brown*, at *Nisi Prius* in *Union Town* in *May* 1795, *M'Kean* Chief Justice remarked, that *William Penn* esquire, the first proprietary, died in *England* in 1718, and his son *Thomas* continued in his minority until 1731, and *Richard* his youngest son until 1732. During this interval, their land office was shut up; so that within that time, warrants and patents were not regularly granted by the commissioners of property for transferring lands to applicants. To further the settlement of the then province during this period, tickets signed by one of the commissioners of property, or the secretary of the land office, came into practice; and hence it would seem, sprung improvements. He further observed, that there were three kinds of rights to lands known in this state, the *jus proprietatis*, *jus possessionis*, and *jus vagum* or an *imperfect* right. Settlement might be ranked among the latter species; it was a right to a preemption;—a claim to a favour.—Improvement titles probably derived their origin from both sources.

The most sacred regard has uniformly been shewn, to *bona fide* settlements, by the proprietary agents. When the decisions of the board of property were regularly kept, I have counted from *January* 1766 to *January* 1769 no less than one hundred cases determined on caveats, wherein the improvement doctrine was recognised.

In early times, such claims were considered as mere personalty, and sold as such by executors and administrators in the course of administration. Indeed no ejectments were thought by counsel, to be supportable on them or even upon warrants or surveys, on the mere *jus proprietatis*, until some time about the year 1760.

1810.

Lessee of
BONNET
_v._
DEVEBAUGH.

In the case of *Campbell's Lessee* v. *Kidd* before cited, Mr. *George Ross* and Mr. *Wilson* of counsel for the plaintiff stated the first recovery which had been known under a mere improvement right, to have been in *Hoover's Lessee* v. *Schreider* in *Northampton* county in *March* term 1769. At *Lancaster Nisi Prius* in *November* 1768, in *Isaac Myer's Lessee* v. *Martin Hefferfinger*, an improvement title in the defendant was established, and took place of a patent. And at *York Nisi Prius*, *May* 1772, in the case of the *Lessee of George Sprenkel et al.* v. *George Stevenson*, an improvement was given in evidence on the part of the plaintiff, though made within the reputed bounds of the manor of *Springetsbury;* and this too against a patent accompanied with a long possession. It ended in terms of compromise. But for half a century at least, lands held by improvement rights, as well as under warrants and surveys, have been uniformly considered as real estates, and subject to all their rules.

The correct idea of an improvement right, before the year 1776 is well expressed in sect. 3 of the act of 30th *December* 1786, 2 *Dall. St. Laws* 487. It was supposed to signify " an actual, personal, resident settlement, with a mani- " fest intention of making it a place of abode, and the means " of supporting a family, and continued from time to time, " unless interrupted by the enemy." I am however strongly inclined to think, that an intention of *immediate residence* was not in some instances deemed so essentially necessary, as it is now held to be. But the *animus residendi* was uniformly thought requisite. Abandonment of the possession without a reasonable cause was always supposed to be a forfeiture of the claim, and though proper allowance would be made for absence upon good grounds, it was held to be incumbent on the party to account satisfactorily for his absence, if he would denominate himself a *bona fide* improver. The doctrine of improvements conduced greatly to the settlement and population of *Pennsylvania;* and happily blended the proprietary interests with those of individuals. Confined within rational bounds, I have always thought the preference given to the improvers of vacant lands, beneficial to the community, and founded on the combined principles of equity and sound policy. It is true, that the opinions of some few

interested persons have degenerated at different periods into wild extremes destructive of the common safety; but they have been corrected and restrained by the sober decisions of the tribunals of justice.

For a few years after the *American* revolution, the sentiments of some of the judges of this court at *Nisi Prius* were unfriendly to settlers and improvers; but a change of opinion took place about the year 1793. Many different acts of the legislature, expressive of the general sense entertained of improvements, had evinced the favourable light in which real settlements were viewed, and were declaratory, as well as confirmatory of former established usage. At length at the courts of *Nisi Prius* held in the spring of 1795, in *Washington* county, in *Howard's Lessee* v. *Pollock* and *Bush*,—and in *Fayette* county in *Cherry's Lessee* v. *Robinson*, (the merits of which cause came on to trial the fourth time) and particularly in *Smith's Lessee* v. *Brown* already cited, wherein the abstract question, whether actual settlers were intitled to preemption by the laws of the state in opposition to a subsequent right expressly created by the laws of *Virginia*, came on to be decided, *M'Kean* Chief Justice, expressed his full concurrence in the ancient improvement doctrine, and the same remains unimpaired to the present day. Numerous instances have occurred in our courts, both before and since the *American* revolution, wherein patents have been postponed to prior actual settlements.

Upon the whole, I am of opinion, that a new trial should be awarded, and that the costs of the former trial should await the event of the suit.

BRACKENRIDGE J. The plaintiff in this case has a legal title. Whether it embraces the possession of the defendant was a question of fact for the jury, who in finding a verdict for the plaintiff, must have found this fact for him; and the judge before whom the cause was tried having sanctioned the verdict by his judgment, it must be taken that, in his opinion, it was according to the evidence; at least not contrary to it. This being the case, and there being nothing shocking or monstrous in drawing such a conclusion of fact from the evidence as reported to us, I do not think it com-

petent to this court to disturb the verdict; nor am I disposed to do it. To an application on that head I shall be as deaf as the rocks:

*Quàm si dura silex, aut stet Marpesia cautes.*

The defendant protects himself by an equitable claim of occupancy and possession. And hence the question of priority arises as to the legal title, and equitable claim; whether the legal title shall attach from the date of the survey, or from that of the return.

Whether the title shall attach from the date of the survey, will depend upon there being a precedent authority to make it. It is alleged that there were written instructions in the hands of the surveyor authorizing him to make the survey.

In evidence of this, testimony was admitted of the *surveyor saying that he had written instructions*, the Chief Justice before whom the cause was tried reserving this point for the consideration of this court. It is clear to me on solemn argument, and due deliberation, that even under the *special circumstances of this case*, under which it was admitted, it was not strictly legal evidence, and should have been refused. The surveyor was not upon oath when he made the declaration; and had he been *on oath*, it could not have been admitted, because it is evidence which supposes something better behind, search for which must be first proved to have been made in order to let in this secondary proof. And though the necessity of search in the deputy surveyor's office is superseded by the fact admitted, or proof that his office was burnt, and his papers lost, yet this does not relieve from the obligation of a search in the offices of those, or amongst their papers, from whom the writing of instructions is alleged to have emanated; the *proprietary agents of that time.* All this must have preceded before even the oath of the deputy surveyor, or of any one else, could be admitted of the existence of the writing or its contents.

But it is alleged that the *warrant of acceptance* recites the survey to have been *by the consent and direction of the proprietary agents.* Such recital would be evidence against the proprietary as laid down by the Chief Justice; but would not affect a third person claiming adversely to the survey, and

denying the existence of instructions or writing to that effect preceding the survey. It must be shewn that such instructions did precede the survey by the instructions themselves, or by proof of their existence, by those who had read and knew the contents. Nor could even such instructions existing, and having issued from the proprietary agents, affect a third person unless there had been an entry of them in the books of the land office, so as to give constructive notice to a purchaser, or there had been actual notice. The proprietary himself is bound by the rules and regulations of his office; and he cannot depart from them to the deception of a third person who has a right to inspect the proceedings, and to expect his grants to issue in the usual mode. This has been held out to the public by the establishment of his office, and equity will hold him to what has been held out. The plaintiff's title therefore cannot attach *prior to the return of the survey so as to affect a third person.*

Whether the defendant had a settlement prior to the date of the return will be a ground of inquiry with the jury on the new trial. It will behove the defendant to make out this in order to defend himself. *For in case of a legal title shewn, the burden of proof lies upon the equitable claimant.*

As to the allegation that the defendant by taking out a warrant for 100 acres has abandoned his claim of 300 acres, under his improvement, if the 100 acres is a part of his claim, it is a presumption of it. It is evidence of this to be weighed by the jury. But if, as is alleged, it was because he could not get a warrant for more; or because he was not able to take out a warrant for any greater quantity at that time; or for any other reason, it will weaken, or repel the presumption; but as correctly laid down by the Chief Justice, this will be a fact for the jury.

New trial awarded.