Tilghman C. J.
after stating the case, delivered his opinion on both points, as follows : — I do not know, that it was necessary for the defendantto give this letter in evidence, because the survey had been returned by Ccvnan, who thereby adopted the act of Wilson, but if the defendant chose to give the evidence, it was proper, because the making of the survey by legal authority was essential to his case, and the authority from Canan being in writing, it might be satisfactory to the jury to see the writing. It was a confirmation of Canan’s testimony, and a fact pertinent to the matter in dispute. Indeed the only plausible objection was, that the letter contained other matter than the order to make the survey; viz. that it was to be made for M'Nitt. As to that, it is to be taken for granted, after the defendant’s opening, that the acts of M'Nitt were not to be considered as having any effect on the plaintiffs’ claim, unless their assent was proved, and that the court intended so to give it in charge to the jury. At all events, it was in the power of the plaintiffs to take the court’s opinion on that special point. Part of the letter undoubtedly was evidence. If the whole was so interwoven as to render a separation difficult, the jury, at the request of the plaintiffs, might have been told that they were to pay no regard to a particular part, unless strengthened by subsequent evidence. Indeed I do not see how the court could have separated one-part of the letter from another, without rendering it unintelligible. It is short, and the whole forms but one sentence. Under all the circumstances of the case then, I am of opinion, there was no error in admitting the letter.
*131 The plaintiffs finding that the defendant’s warrant was older than their application, endeavoured to support their title by an improvement prior to the warrant of the defendant, and for that purpose offered the deposition of William M'-Nitt; the defendant objected to this deposition, and the court rejected it, on which the plaintiffs excepted to their opinion. It has so often been decided, that it must now be considered as settled, that when one derives title under a xvarrant, he is estopped from carrying his title back farther than the time fixed by the warrant for the commencement of the calculation of interest. This principle is founded on sound reason. The proprietaries were entitled to interest from the time when the land was first occupied by the warrantee. It was his duty therefore, to tell the truth, when he took out his warrant. But, if he told a falsehood, with a view of defrauding the proprietaries, it was but justice, that he should be bound by his own assertion on all future occasions. But the plaintiffs contend, that there is a difference between a warrant and an application. The former, they say, fixes the time when interest shall commence, but in the latter, no interest is to be paid till six months after the date of the application. If the fact were so, the plaintiffs would have a strong case. But on examining the proprietory regulations, it will be found, that although the mode of taking up land by way of application, was introduced in order to favour poor settlers, who could not advance the purchase money, yet it never was intended, by any species of grant, to exempt the taker up of land from the payment of interest from the commencement of his settlement, if that settlement had taken place before the date of his warrant or application. In a regulation of the land office, bearing date the 17th June, 1765, the modeof taking up by application, is introduced and explained. By the 5th section, “ all persons possessing or claiming lands, on account of “ any settlement or improvement, are required to enter' their “ application in the land office, whether on the east or west side “ of the Susqnehannah, and to bring with them authentic cer- “ tificates from some neighbouring magistrate, of the value “ of their improvements, and the time xuhen their settlement “first began.” And by the instructions to the deputy surveyors, dated 3d October, 1765, they are enjoined “tobe “ very careful in every survey made, either on applications “ for lands as unimproved, or on warrants for improvements, *132 « since the opening of the office for granting land on the new “plan, the 5th August, 1765, where they find any improve-u ment on the land, to inform themselves, and report to tire « office, with their return of the survey, when such settlement “ or improvement was first begun; and where the land has no “ improvement on it, but joins some other land of the appliers, « which has been settled or improved, or has been granted to “ him by warrant, they are then to express in their draught, « or return of survey, that it joins such other land of the “ applier.” It appears plainly by these regulations and instructions, that the proprietaries considered it as an important point, to be informed, of the commencement of the improvement, that they were well aware of the artifices practised, to conceal that circumstance, and were determined to obtain the knowledge of it, by all means in their power. The terms on which lands were granted, were varied from time to time, but when the patent issued, it was always on the terms which were in use when the title commenced, that is to say, when the improvement was begun. I can see no reason therefore, for a distinction between warrants and applications, nor do I know that such distinction has been recognised by any judicial opinion. On the contrary, when the point was brought before Judge Yeates, in Coxe’s lessee v. Ewing et al. (Bedford Circuit Court, October 1807,) he held that warrants and applications, were on the some footing, and that if the application mentions an improvement, without stating when it began, it is to be considered merely as matter of description, and does not authorise the applicant to carry his title farther back than the date of the application. The deposition of MiNitt therefore was not evidence, because it went to prove a fact which the plaintiffs were estopped from proving.
Upon the whole, my opinion is, that the judgment should be affirmed.
Yeates J,
The plaintiffs in error have contended, that the letter written by John Canan, deputy surveyor of the district, to William Wilson, dated 4th June, 1807, directing him to make a survey on the application of John M<-Nitt, ought not to have been received in evidence, and that at all events, it was offered prematurely. I do not view it in that light. It was a mere deputation to an assistant to make the survey, and the writing was the highest and best evidence of *133 that fact. It was offered, as is stated in the bill of exceptions, for the express purpose of shewing the authority under which Wilson acted, in order to introduce what passed between M'Nitt and the plaintiffs upon that occasion. The jurors alone were competent to decide, whether the acts and words of the plaintiffs, or either of them, at that time, amounted to an acquiescence in the survey which was then made. But the letter contained no facts which had not been testified to, before its production. It was certainly good evidence by way of corroboration of Colonel Canarís testimony, and if it was evidence in any point of view, it ought to be received. It was of moment to ascertain, that the survey made under M'Mtfs application, excluding the lands in question, was regularly and fairly made.
The second bill of exceptions was taken to the opinion of the court over-ruling the deposition of William M'-Nilt. The substance of it was, that he assisted John M'Nitt in the month of October, 1760, 1761, or 1762, (but in which of the years, he 'was uncertain,) in building a house of about eighteen feet square, on the land in dispute, and planting apple seeds and peach-stones in the ground near the house, and inclosing the same with rails, which were cut and mauled upon the land cleared; that it was intended by John M'Nitt, to return to the land in the spring following, and follow up his improvement, but the Indian war, which broke out the ensuing summer, prevented it. I will not stop to inquire what kind of equity such acts would confer, independently of an office title, when the improvement was not pursued for five, six, or seven years, according to the time when the same was really commenced. The broad question is, whether it is competent to a plaintiff claiming lands by application, without specifying any improvement therein, or bringing with him the certificate of a magistrate, of the nature of his improvement, and the time -when his settlement first began, to give evidence of improvement made by him prior to the defendant’s title, which has preceded the date of the plaintiffs’ application. The pretensions of the parties were as follow.
On the 21st January, 1767, John M'Nitt entered an application for 300 acres of land, on the waters of Sheaveds creek, bounded, &c., without mentioning any improvement made thereon. On the 11th December following, he paid William fflCiay, 2/, 10i. (for his surveying fees), and it appeared by *134 the field notes of Ml Clay, that a survey had been made by him, which had not been returned into the office of the survey0r general. AB-Nitt conveyed to Thomas Ewing, the father of the plaintiffs, on the 22d June, 1773, with a covenants of general warranty. The defendant held under two warrants, dated 18th February, 1763, granted to Andrew Armstrong, surveys made thereon, on the 20th AAay, 1766, which were returned into the office of the surveyor general, on the 4th December following, and deduced a regular title by divers mesne conveyances under Armstrong. Thus it appeared, that the plaintiffs’ application was posterior to the defendant’s warrants, nearly four years, and that the surveys made on the warrants, were actually returned into the proper office, above six weeks before John M’-Nitt applied for the lands.
In Bonnet's lessee v. Devebaugh et al. (3 Binn. 186,) I expressed my sentiments pretty much at large on the subject of improvements in this state. Upon what sound basis does the equitable claim of an honest improver to a pre-emption right rest? I answer unhesitatingly, upon no other ground than the general understanding of the community, sanctioned by long usage of the proprietary officers,-that they would prefer bona fide settlers who were willing to pay interest on the purchase money, to subsequent applier's for the same lands. In Campbell’s lessee v. Kidd, at Carlisle, in June, 1774, (cited 3 Binn. 186,) it was held by the court- that the encouragement given by the proprietories and their officers to improvements was such a sanction as amounted to an - implied contract on the part of the lords of the soil, that they would grant the lands to the improvers on the usual and common terms, and should the proprietories refuse the terms so offered to them by an improver, chancery would decree a specific performance. But it is a principle of justice universally acknowledged, that he who seeks equity, is bound also to do equity. No man can reasonably expect an exemption from the accustomed conditions of sale. It is no more than mere justice, that the improver, who founds his pretensions upon an early settlement, regularly-pursued as far as circumstances would admit, should pay interest for the time he occupied the soil. An implied contract to this effect must necessarily be presumed to have pervaded the whole system of the land-office. I most readily acknowledge the patient forbearance and kindness of the late proprietaries, as the owners of the soil, but I have *135 never heard it asserted that they relinquished any .part of their claims to arrearages upon the sale of lands. Upon this subject we are not left to conjecture.
The application system took place under the advertisement of William Peters, secretary of the land-office, dated 17th June, 1765, (2 Sm. Laws, 160.) The 5th regulation therein is as follows : “ All persons possessing or claiming “ lands on account of any settlement or improvements, are required to enter their applications in the land-office, whether “ on the east or west side of Susquehannah, and to bring with «them authentic certificates from some neighbouring magis- “ trate of the nature of their improvements, and the time when “ their settlement first began, and in default or neglect of such “ applier so to do, within six months from the time of open- “ ing the said office, on the 5th August next, the application “ of any other person or persons will be received for such “lands.” Ib. 161. The land-office was opened generally on the 5th August, for lands on the east side of the Susquehannah, and for improved lands, on the west side upon the new plan. On the 1st August, 1765, the board of property resolved, that “ as to lands on the east side of the river, the secre- “ tary shpuld give warrants to such persons as had built on “ and resided on the land they applied for, and had a just “ claim to, as an improvement, bringing a certificate from a “ neighbouring magistrate, or other satisfactory proof of the “ nature of the improvement, and first settling thereof, when “ the interest and quit-rent is to commence.” And on the 10th August, 1765, they further ordered, that “where a piece “ of land applied for adjoined a settled plantation, the secre- “ tary should grant a warrant with interest and quit-rent from “ the time of the settlement of the old plantation.” Ib, 162.
Upon the 3d October, 1765, an additional instruction was given to-the deputy surveyors, “to be very careful in every “ survey they should make, either in applications for lands as “unimproved, or on warrants for improvements since the “ opening of the office for granting lánd on the new plan, “ when they should find any improvement on the lands, that “ they should fully inform themselves and report to the office “ with the return of survey, when such settlement or improve“ment was first begun,” &c. Ibid. On the 1st August, 1766, the office was opened on the new plan for the west side of the Susquehannah on the same terms as on the east side. Ib. 164.
*136 These regulations strongly shew the sense of the proprietary agents on the subject before us,, and evidently embrace the present case. To me it appears highly absurd, that John MNitt should be supposed to have it in his power to change his relative duties, by talcing out an application instead of a warrant, and thus exempt himself from the payment of arrearages of interest. It is repugnant to my ideas of moral honesty and distributive justice. It has frequently been decided, that a warrant holder precludes himself from deriving his equitable title of improvement beyond the day called for in his warrant. I can see no substantial ground why the same rule should not hold as to applications, where the time of commencing the original improvement is not specified therein, or where a certificate of such improvement has not been filed with the application, agreeably to the rules of the land-office. Amongst other cases on the subject of warrants, my sentiments will be found in Carrol's lessee v. Andrews, at Washington, in October, 1800, (2 Sm. Laws, 177,) Merchant's lessee v. Millheisen, at Greensburg, in November, 1800, (Ib. 165. 178.) Nichol's lessee v. Lafferty, at Pittsburg, in November, 1801, (Ib. 178,) and Reigart's lessee v, Samuel, at Bedford, in November, 1803, which I will not now repeat.
It was asserted during the argument of this case, by one of the plaintiff’s counsel, that Coxe's lessee v. Ewing et al. at Bedford, in October, 1807, was strangely misreported in 2 Sm. Laws, 178. The report of that case is short, but I take it to be correct in every particular, as far as it goes. It contains no statement of the conflicting titles, which I will therefore detail from the notes of the trial now before me.
The suit was brought against five defendants. The plaintiff deduced his title under two warrants ; the first thereof in the name of Gabriel Peterson, dated 20th September, 1762, for two hundred acres on the south side of Juniata, including two Deer Licks about four miles below the mouth of Tellow Creek; the other warrant in the name of Samuel Johnston, dated 25th October, 1765, for 300 acres on the south side of Juniata, including part of Gabriel Peterson's improvement, and adjoining lands granted to the said Peterson, below the mouth of Tellow Creek; interest to commence on 1st March, 1760.
The defendants held under two ancient settlements, and also under the following office titles: — One application by *137 William, Sparkes, dated 6th February, 1767, for 100 acres on the south side of the Ray's Town branch of Juniata, including his improvement, upon which a survey of 108 acres and 45 perches was made on 3d August, 1786, and a patent afterwárds issued on the 24th November, 1787, in consideration of 15/. 8,?.; one other application by Robert Triggs for 200 acres on the Ray's Town branch of Juniata, including his improvement between Frederick Founders and William Sparkes, upon which a survey was made, on the 17th July, 1787, and a patent afterwards issued, on the 4th March, 1797; also a warrant to Philip Stones, for' 100 acres adjoining his other land, on the south side of the Ray's Town branch of Juniata, and a conditional line made between William Sparkes and Robert Triggs, upon which 8/. 6s. was paid on the same day to the receiver general.
The defendants offered parol testimony to prove two bona jide settlements made by Sparkes and Triggs, on the lands in question, in 1763 or 1764, regularly continued, unless when interrupted by Indian hostilities. The lands were stated to lie, six miles from the mouth of Tellow Creek. This evidence was excepted to, on the ground of the decisions in the causes before cited.
The regulations adopted on the opening of the land office, in August, 1766, were adverted to, and reasoned on, by the counsel on both sides, but were not produced. The defendant’s counsel contended, that interest was not chargeable on applications by the usages of the land office;" and that it would be highly unjust, that one should suffer in his claim to lands by reason of his conformity to the rules established by the proprietary officers, over whom he had no controuL The appliers had done what was incumbent on them to do, in stating their improvements, in their two applications. The plaintiff’s counsel insisted, that the introduction of applications did not supersede the practice of taking out warrants to secure prior improvements, and that specifying an improvement in an application generally, was mere matter of further description, and had always been so understood. In support of their assertion they produced three warrants for lands, on the west side of the Susquehannah, severally dated, in 1767, wherein improvements were called for, the interest to commence at previous periods of time. I assented fully to these latter remarks, and gave the opinion ascribed to me, in 2 Sm. Laws, *138 178, and stated explicitly, “ that such improvements could “ not be adduced to establish an equitable title, anterior to a guc]1 general application.” I had no means o.f recurring to the advertisement of the secretary of the land office, of the 17th June, 1765, or the subsequent regulations mentioned before, and therefore was silent as to the effect of an application, accompanied with a proper certificate of the commencement and nature of the improvement.
Besides the reasons on which I permitted the parol testimony to go to the jury, detailed in 2 Sm. Laws, 179,1 gave an additional reason not mentioned in the report, founded on the defendant’s possession. No evidence whatever was given previously, nor at any period of the cause, of any improvement made by Gabriel Peterson, on the lands in controversy, nor of any remarkable Dee? Licks thereon, although it was shewn in the conclusion, that there were several saltish ponds in the different bends of Juniata. If the plaintiff had shifted the call of his warrants, his title would rest only on the return of his survey, unless it was known to the adverse party previously. At all events, the description of the land was vague, from the defect of testimony, as to the improvement of Peterson, and the two salt licks, and the warrants did not specially and ex- ' clusively designate the premises in dispute. Considered in this point of view, the title could only attach from the time of survey. But, when was this made ? The time of making it was not inserted in the return, nor shewn by any evidence whatever. The not specifying it in the return is a suspicious circumstance, and a departure from the uniform method observed in such cases. But although the time cannot be fixed when the lines were run on the ground, we know Certainly, that it must have been posterior to the month of October, 1765, when Johnson’s .warrant issued, because it appears, that a joint survey was made on both warrants, and a joint return made on the 19th March, 1791, into the office of the surveyor general. The plaintiffs’ title is thus left in a state of uncertainty, and the defendants are at liberty to shew that there were two fair settlements on the lands, which were protected by the bounty of the lords of the soil. If they shewed the survey to be invalid, it precluded the plaintiffs from recovery. At the desire of the plaintiffs’ counsel, I noted the decision I had given, but it was not afterwards stirred in bank.
*139 There is a striking dissimilitude of features, between Coxe’s lessee v. Ewing and others, and the present case, as they present themself to the view of the Court.
I am of opinion, that the Court of Common Pleas acted correctly in rejecting the testimony of William M'Nitt, in the Present instance, and that the judgment below be affirmed.
Brackenrid.ge J. concurred.
Judgment affirmed.