## Graffius *against* Tottenham.

In an action of ejectment, a defendant is not estopped from setting up a *title* under the Statute of Limitations by the fact, that he took a warrant for the land, and fixed a period for the commencement of interest within twenty-one years from the time of suit brought; it appearing also, that a previous warrant had been granted for the land to one under whom the plaintiff claimed.

If one enter upon land claiming but without title, and die in possession, leaving a widow and children, one of whom continues in possession, and conveys the land to a third person, who goes into possession and continues it to a period beyond twenty-one years, the law will tack these possessions together so as to make a good title under the Statute of Limitations, the title being out of the commonwealth.

ERROR to the Common Pleas of *Clinton* county.

Daniel Graffius and others against Leonard Tottenham and others. This was an action of ejectment for two tracts of land, in which the defendants took defence for 1 acre and 150 perches on the bank of the Susquehanna.

The plaintiffs gave in evidence a perfect paper title to the land in dispute, and the defendants relied upon a title by the Statute of Limitations. The opinion of the court below, which was the subject of the errors assigned, gives a statement of the case and points raised by the defence.

WOODWARD, President.—The defendants allege that possession of the land in dispute was taken by Edmund Huff in 1816, and continued until his death in 1819, and that his widow and one of his sons remained in possession till she died in 1820. The evidence of these facts is full and uncontradicted, and if you believe it, it would seem that old Edmund Huff had taken such a possession of this land as, if continued twenty-one years, would give him title thereto. But at the time of his death he had no title under the statute, and yet he had such an interest in the land as would and did actually descend to and vest in his heirs as tenants in common. It was such an interest as the law recognises for many purposes. It was liable to seizure and sale for his debts; he might maintain trespass in respect of it; it would pass by alienation; and it vested at his death, like any title to real estate, in his children, who were his heirs. James Huff was one of the children in whom an interest vested: if you believe the evidence as to his entering into possession immediately or very soon after his mother's death, the presumption of law would be, that he entered as heir to his father, and was holding the possession for himself and the other heirs. He could not set up title in himself against his bro-

thers and sisters until he had done something to manifest his intention of holding adversely to them; and the court is unable to see any evidence here that would enable James, even if he had been in possession twenty-one years, to exclude his brothers and sisters from the benefit of it.

The possession of the father was continued for the benefit of the family, and on the 14th of April 1830, James makes a deed to the defendants for the land, and places them in possession, who continued it until suit brought. Now, what did James convey by that deed? Evidently no more than his interest, which was an equal share with each of the other children of his father. If there were nine of them, he conveyed an undivided ninth part, and thenceforth the defendants became tenants in common with the other children of Edmund Huff. If you find the entry and possession of Edmund Huff to have been such as I have explained they must have been to give title under the statute, and that the possession has been kept up by James Huff and the present defendants, until twenty-one years had elapsed before this suit was brought, then a complete title has been shown in the defendants, and the heirs of Edmund Huff, exclusive of James, to the land in controversy; and the plaintiffs cannot recover.

The plaintiffs have shown by their warrant, survey, and patent, that the title of the commonwealth had been granted; and to such a possession, on appropriated land, the statute attaches its protection.

But the plaintiffs allege, and have requested the court to charge the jury, that the defendants cannot avail themselves of the benefit of any possession or improvement of this land, prior to March 1820, because that, on the 27th of August 1830, they applied for a warrant for 400 acres of land, including this improvement, and then proved by their grantor and witness, James Huff, that this improvement was commenced in October 1820, and not before. From the warrant it appears that, for some reason not explained, the date of the improvement was fixed in *March*, instead of *October* 1820.

The object of the law in requiring proof of the commencement of an improvement by the applicant for a warrant, was to fix the time truly, if he can ascertain it. His warrant and title relate back to the time at which he pays interest, and no matter what may be the date of his warrant, survey, and patent: there, in the beginning of his improvement, is the beginning of his title. But if he alleges and proves a date to his improvement, short of the true one, and pays interest from it only, he shall not afterwards be permitted to show in court the true date, for the purpose of carrying *that* title back to an earlier period than he fixed in his dealings with the commonwealth. He is estopped from showing the truth. His improvement is by supposition earlier than is mentioned in his warrant, but he is not permitted to show this

I. — 62

fact when he sets up title under that warrant, for this would be to allow him to derive an advantage from a fraud practised against the commonwealth.

To illustrate :—The plaintiffs in this case claim under a warrant of 1793. Suppose old Mr Huff had commenced an improvement on the same land in 1790, but in 1830, when he, and others claiming under him, apply for their warrant, they prove the improvement to have been commenced in 1800. They know nothing of the warrant of 1793, and they suppose 1800 is early enough for their purposes ; but when they are sued, they find it necessary to carry their improvement warrant back to the true and real date of the improvement, in order to defend themselves against the warrant of 1793. But this they may not do ; they are estopped by the date they furnish to the commonwealth, and have abandoned all prior improvement. They might have availed themselves of it, but they chose to abandon it, and they are concluded thereby. This position is abundantly established by the authorities cited in the argument ; but in all the cases cited, as in the case supposed, the party estopped was setting up title under his improvement warrant, and the effort was to carry that title back to a period earlier than the date assigned for the commencement of interest. But though this may not be done, may not the party set up another, and a distinct title ? Is he estopped from showing that in another way, and by other means, he has acquired an available title ? I think not. If the defendants were setting up title to this land under their improvement warrant of 1830, this principle of estoppel would apply. But they set up no such title, nor ask to extend their improvement back to an earlier period than that assigned to it in their application. They repudiate that title wholly. They have not brought it into court, and we should not have heard of it if the plaintiffs had not told us. The defendants stand on a distinct and separate title — a possession under the Statute of Limitations. This is a title which is as well defined, and where the necessary facts are proved, is as real and as distinct from the title under an improvement warrant, as any title can be. This title to be available must be founded, as we have seen, in a possession of *appropriated* lands ; an improvement right can only exist in *unappropriated* lands. An improvement right must be accompanied with a continued intention on the part of the settler to pay the commonwealth ; a possession under the statute need not be accompanied with any such intention. An improvement must have an actual resident settlement ; a title may be acquired under the statute by enclosure and cultivation without residence. So there is a real and well-understood difference between a title by improvement, and one under the Statute of Limitations.

Now, the question is, are the defendants estopped from showing their title under the statute, by their assignment of a wrong date to their improvement, in the application for their warrant ? Cer-

[Graffius v. Tottenham.]

tainly not; for the reason of estopping them has ceased. We saw that reason to be, that *they might not be advantaged by a fraud practised on the commonwealth;* nor are they, since they have abandoned their warrant altogether. They claim nothing from the commonwealth. They admit she has granted no title to *them,* and their defence proceeds on the assumption that she has granted all her rights to another. And their fraud, if there was any, imparts no advantage to their title under the statute; so that the reason of the doctrine contended for has ceased in this case, and the doctrine does not apply.

It has been insisted on further by the plaintiffs, that they are *bona fide* purchasers, with notice of an improvement commencing in 1820, and not before; and that they had no notice of the claim which the defendants now make to the land—that they purchased on the faith of the records in the land office, where the defendants had placed their admission that their title originated in 1820.

The defendants' title by warrant is a nullity, because the land was appropriated in 1793; and this, the records of the land office showed to the plaintiffs truly. But, as purchasers of the title under the warrant of 1793, they would not look into the land office for evidence of the defendants' title under the Statute of Limitations. Concerning this point, they should obviously have inquired of the tenant in possession, and that possession was notice which must affect them now.

If, therefore, under the principles of law which have been given you in regard to titles under the Statute of Limitations, you find the necessary facts to make out such a title in the defendants, and the heirs of Edmund Huff, the plaintiffs have shown nothing which in law prevents the defendants from availing themselves of that title, and your verdict should be for the defendants.

*Armstrong,* for plaintiffs in error, contended that the warrant which the defendants took out in 1830 for the land in dispute, was an abandonment of any former title or claim under the Statute of Limitations; and because they dated interest back to 1820, they were thereby estopped from giving any evidence of, or claiming title under, any improvement or possession of the land prior to that date. 3 *Yeates* 591, 59, 272; 5 *Serg. & Rawle* 181; 4 *Serg. & Rawle* 434. The possession of James Huff cannot be tacked to that of his father, for it does not appear that he claimed under him; on the contrary, he claimed for himself, and adversely to his brothers and sisters, for he sold the whole land to the defendants, and not his share as one of the heirs of his father. His possession, therefore, was the commencement of a new right, and not sufficient to bar the plaintiffs' recovery.

*Campbell,* for defendants in error, argued that the defendants did not claim title under any warrant; that was the plaintiffs'

own showing. After the defendants took out their warrant, they discovered that the land had been previously appropriated by the commonwealth, and then abandoned it. This mistake, although it contained an allegation as to the time of the commencement of interest, which was not sustained by the fact, is not to preclude the defendants from setting up a good title, independent of any warrant. There was no fraud practised upon the commonwealth by their selling us land which they had previously sold to another person. The principle of estoppel is only applicable as between the grantor and grantee; a stranger, as the plaintiff here is, cannot avail himself of it. 8 *Watts* 215; 10 *Watts* 224. It operates only between parties and privies. 7 *Watts* 405; 6 *Watts* 288.

The opinion of the Court was delivered by

GIBSON, C. J.— Though there is no inherent privity between trespassers, it was held, in *Overfield* v. *Christie*, (7 *Serg. & Rawle* 177) that a tortious possession may, by our law, be transferred by deed or will so as to complete the bar of the Statute of Limitations, by the additional adverse possession of the transferree; and such possession is transmissible by descent, even according to the English law. Did James Huff then succeed, by his entry, to the whole of his father's adverse possession, or only to an undivided share of it? He came in at the death of his mother, who had kept the family together on the place for less than a year after his father's death. It is not denied that, as a tenant in common with his brothers and sisters, he succeeded to so much of his father's possession as appertained to his own share, but it is denied that he succeeded to any more of it; and as it was not shown that the brothers and sisters had entered for themselves, it is argued that there was no actual possession of their shares in them to displace the constructive possession of the lawful owners, and that the statute consequently ceased to run in favour of their undivided interests; but that, in any event, as James did not succeed to them by deed or will, he could not, on the principle of want of privity among trespassers, tack his adverse possession to that of his father for more than his own share.

His entry merely would certainly not be an abatement of the shares of his brothers and sisters. That principle is distinctly asserted in *Sharrington* v. *Stratton*, (*Plowd*. 306) where it is stated that, "if the father dies seised of the land, and the youngest son enters, the oldest son shall not have an assize of *mort d'ancestor*, or a writ of right, or any other action against him; for the law presumes that he who is so near to him in blood is also as near to him in love, and therefore it cannot be supposed that he entered as an enemy, but as a friend, to preserve the inheritance in his absence." Without more, then, the law would presume that James had entered, not to abate the shares of his brothers and

sisters, but to preserve them for their use; and his entry being consequently theirs, there would be privity enough between them to unite every part of his possession to that of their common ancestor. It would presume that he was in possession without wrong to them; and as the possession of one joint tenant was deemed, in *Ford* v. *Grey*, (*Salk.* 285) to be the possession of the other, so far as to prevent the Statute of Limitations from running against either—a consequence attributed, in *Carothers* v. *Dunning*, (3 *Serg. & Rawle* 381) to such a possession between tenants in common—the possession of James would be the possession of all the rest, to give the statute entire effect in their favour.

Thus would stand his entry, unaffected by his subsequent conveyance to the defendants, which, however, serves not to weaken the case. The English law, in regard to parceners, is laid down by Lord Coke, (1 *Inst.* 374 *a*) where he says that when "the one sister entereth into the whole, the possession being void (vacant), and maketh a feoffment in fee, the act subsequent doth so explain the entry precedent into the whole, that now, by construction of law, she was only seised of the whole; and this feoffment can be no disseisin, nor any abatement, because they both made but one heir to the ancestor, and one freehold and inheritance descended to them." Now, though the children of an intestate decedent have not, with us, an *entirety* of interest as in joint tenancy, or even a *unity* of interest as in coparcenary, but, by the words of our statute, a severalty of interest as in tenancy in common, yet we must respect our own usages which attach consequences to particular acts in the completion of an inchoate title, which would not be attached to them in the parent country. In Pennsylvania, the name in a warrant has been considered a very slight indication of the ownership of it. It was a common practice to use the name of a stranger without consulting him; and almost any act of ownership, in the prosecution of the title, was considered *primâ facie* evidence of a trust for him who performed it. "We know," said Mr Justice Yeates, in *Cox* v. *Grant*, (1 *Yeates* 166) "that in general the name in the location was merely nominal, and used as a kind of scaffolding for the building up of a formal and regular title;" and this practice received peculiar indulgence between those who stood in the relation of parent and child. "In the case of a father making an application in the name of his children," said Mr Justice Smith, in *Fogler* v. *Evig*, (2 *Yeates* 120) "it shall be presumed to be for the use of the father." Why shall it not equally be presumed to be for the use of the father's heirs, when made on the foundation of his improvement in the name of one of his sons? Nothing is more usual, in such a case, than for the oldest, or some other son to enter and consummate the improvement for the use of the family, by a warrant and survey in his own name; and to convey the legal title to a purchaser, when the land is turned into money for purposes

I. — 2 R

[Graffius v. Tottenham.]

of partition. To imply a disseisin, or an abatement from the con-veyance of such a warrantee, would be to imply a tort, against the truth of the case, to the persons intended to be benefited by it; and such an implication would, in this instance, do them a substantial injury by means of a constructive wrong. It may be said, that if the warrant was taken out for the use of the family, it might have been proved. These arrangements, however, usu-ally take place upon an indistinct understanding, and without any specific agreement; so that it is difficult to prove them by the testimony of the family, even when they are competent wit-nesses on the score of interest. It would be dangerous, therefore, to imply an ouster of the rest of the family from a conveyance by one of the sons in his own name; and it is much more safe to apply the principle of *Fogler* v. *Evig* to such a transaction, wherever the presumption is not rebutted.

I have treated the case as if James Huff had taken out the war-rant in his own name before the conveyance; but it is certainly not the weaker because it was taken out in the name of his vendee.

Another objection has been urged, which would preclude de-fence on the Statute of Limitations altogether. This ejectment was brought in February 1840, and the commencement of the set-tlement is stated in the application to have been in October 1820; so that if the beginning of the adverse possession may not be car-ried further back, the intervening time will be too short. The dis-ability incurred from misrepresenting the commencement of an improvement has never been extended further than to preclude the party from carrying back the commencement of his *improve-ment* title beyond the day specified. It was said by Chief Justice Tilghman, in *Ewing* v. *M'Knight*, (1 *Serg. & Rawle* 131) "that when one derives title under a warrant, he is estopped from car-rying his *title* (under the warrant) further back than the time fixed by the warrant for the calculation of interest." "The war-rant-holder," it was said in *Nicholls* v. *Lafferty*, (3 *Yeates* 272) "has precluded himself from deriving *his equitable improvement* beyond the day called for in the warrant." It was not said that he should not set up a subsequently acquired title which had been adverse to his own; and what else is a title acquired by the Sta-tute of Limitations, which, according to *Pederick* v. *Searle*, (5 *Serg. & Rawle* 240) transfers, to the adverse occupant, the title against which it has run. To give evidence of adverse possession is not to carry back title by the Statute of Limitations to the beginning of it; for the statute is not maturing an inchoate title while it is running its course against an adverse one. The title of the ori-ginal owner is unaffected and untrammelled till the last moment; and when it is vested in the adverse occupant by the completion of the statutory bar, the transfer has relation to nothing which preceded it: the instant of conception is the instant of birth. But

[Graffius v. Tottenham.]

the Chief Justice further said in *Ewing* v. *M'Knight:* "It was his (the applicant's) duty to tell the truth when he took out his warrant; but if he told a falsehood, with a view of defrauding the proprietaries, it was but justice that he should be bound by his own assertion on all future occasions." This is a most righteous principle, but it is inapplicable to the case before us; for it is one thing to allege a possession by settlement *and* cultivation as the foundation of an improvement title, and another to allege an adverse possession by *enclosure*, or cultivation *without* residence, to gain a different title by the Statute of Limitations: and it is certainly no reason that because the applicant has defrauded the commonwealth, he shall not be at liberty to assert a title against any one else. The consequence of such a fraud is an estoppel, not a forfeiture of the land. In proving an earlier adverse possession, the defendants proved an earlier improvement along with it; but that this was immaterial, is shown by *Coxe* v. *Ewing*, (4 *Yeates* 431) in which it was ruled that though an improvement cannot be carried back to establish a title anterior to the time specified in the application, yet the evidence of it may be received to show that the survey of the other party *could not legally take effect.* "If it included the *bona fide* settlement of third persons," said Mr Justice Yeates, "it could not have received the sanction of the land office, or of the country, from their uniform usages. It is true that by going into the testimony, the defendants will receive a degree of benefit from improvements, the *equity* of which they seem to have abandoned; but this appears inevitable, and flows as a necessary consequence from the investigation of the validity of the survey made for the plaintiffs." Thus all the cases go upon the ground that a fraud in this particular is a relinquishment of the equity of an earlier improvement; but a title by the Statute of Limitations is not founded on an equity: it is purely legal. The principle of *Coxe* v. *Ewing* was reasserted in *Wells* v. *Wright*, (3 *Wash.* 250) in which it was ruled that though a party can not set up title by settlement prior to the day stated in his warrant for its commencement, he may nevertheless give evidence of an earlier settlement for the purpose of contesting a settlement right claimed on the other side. These two cases prove the rule to be that the applicant shall not go further back for the origin of his own title than the day assigned to it in his warrant or application, but that he may do so to affect the adverse title of another; and in that aspect, the evidence of an earlier adverse possession was competent and conclusive.

Judgment affirmed.