# Schall *et al. versus* The Williams Valley Railroad Company.

A title acquired by twenty-one years' adverse possession, under the statute of limitations, is an absolute one; and is not barred by a subsequent neglect to keep up the possession, as against a *bonâ fide* purchaser, without notice, of the adverse paper title.

The title thus acquired being indefeasible, the subsequent neglect to keep up the possession, conferred no equity on a purchaser of the outstanding paper title, upon which the statute of limitations had closed.

ERROR to the Common Pleas of *Schuylkill county.*

This was an ejectment by the President and Directors of the Williams Valley Railroad Company, against John Schall and Andrew Jones, for a tract of 144 acres of land in Lower Mahantongo township.

The facts of the case are fully stated in the following charge to the jury, delivered in the court below by GRAHAM, P. J. :—

" The plaintiff in this ejectment claims to recover 144 acres and allowance, situate in Lower Mahantongo township, Schuylkill county. The land in controversy was granted by the Commonwealth to John Lesher, by warrant dated 3d November 1784, for 170 acres, including an improvement on the Broad Top Mountain. Upon this warrant, a survey of 144 acres was made, the 5th of May 1785.

" On the 16th March 1797, John Lesher, the warrantee, conveyed to Ludwig Schwartz, to whom a patent issued the 25th February 1803. Ludwig Schwartz conveyed to John Snavely by deed of 31st March 1838; and in September 1838, Snavely conveyed to Robert S. Flemming, Leander N. Ott, James Flemming, Joseph W. Cake, and W. F. Fahnestock. These grantees of Mr.

[Schall *et al. v.* The Williams Valley Railroad Company.]

Snavely, by their several deeds of different dates, from December 1839 to January 1840, conveyed to the plaintiffs in this action.

" From the foregoing recital of the plaintiffs' title, you will see they have exhibited an unbroken chain from the Commonwealth, and unless the defendants have shown a better title, one that will defeat the plaintiffs', the plaintiffs ought to recover.

" The defendants have shown no title from the Commonwealth, nor any conveyance of the title acquired by the Lesher warrant and survey, but claim title under the statute of limitations, by virtue of actual possession, by residence, and clearing and cultivation of the land, for a period of twenty-one years, by themselves and those under whom they claim. They have shown a deed from John Myer to Christian Bartche, for 400 acres, dated 3d August 1801, surveyed to John Witman, on warrant dated 1st July 1793.

" This Witman tract lies near to the Lesher survey, and, although there is no evidence of the purchase of the Lesher tract by Bartche, the evidence tends strongly to show he claimed it in some way, either by colour of title, or as an intruder. He put his parents upon this improvement to live; and, when his property was afterwards sold by the sheriff to William Green, and conveyed by deed of 22d September 1806, it is described as 700 acres. On the 24th February 1807, Green contracted with Joseph Keffer for the sale of the 700 acres, which contract was executed by deed dated 24th October 1810, endorsed on the sheriff's deed to Green. That Keffer then considered the Lesher tract was a part of this purchase of 700 acres, we think is apparent, from the facts proved by his son, Daniel Keffer, who says, his father claimed it until it was sold, and moved upon it and cleared land, and exercised the ordinary acts of ownership, and that he claimed 700 acres. The land that the saw-mill was on, the Lesher tract, he called 300 acres, and the tavern tract 400.

" In 1818, this Lesher tract, as defendants allege, was levied on by the sheriff, on a warrant issued by the county commissioners, against Joseph Keffer, who was a defaulter as tax collector. It is described as 200 acres, more or less, adjoining lands of Conrad Fager, Leonard Rishel, and others. It was bought by John Hammer, county treasurer, and conveyed by him to the county commissioners in 1819. In 1830, the county commissioners conveyed to Benjamin Becker, Charles Frailey, and John Schall. In 1834, Mr. Frailey assigned his interest to Schall, and in 1848 Schall assigned an undivided fourth to Andrew J. Jones.

" To acquire title under the statute of limitations, the possession must be actual, continued, visible, notorious, distinct and hostile, for a period of twenty-one years, by actual residence upon, or cultivation of the land; and, to include wood-land, there must be boundaries marked and designated by the claimant, or the tract

must have known boundaries, and the claim be co-extensive with such known and marked boundaries. The possession must be such as to evidence a claim of ownership to all the world by such unequivocal acts of residence or cultivation as can be seen and known to all observers.

"Although the possession must be continued for a period of twenty-one years to acquire title under the statute, it is not necessary that there should be a tenant living upon the land, or actual cultivation of it every year. When the possession is by tenants, and not by the claimant, a tenant may move unexpectedly, and it may be some time before another can be procured; and good husbandry requires that the soil should have occasional annual rests.

"When, therefore, there is an interruption of the tenancy from this cause, which is not permitted to continue longer than another tenant can be procured, and the cultivation of the land is not suspended further than the practice of proper husbandry would sanction, this would not prevent the statute from running in favour of the claimant. It is not necessary that there should be possession by a personal residence on the land, and by cultivation of the soil; either residence or cultivation, is all the law requires to acquire title under the statute. There is also a distinction as to the extent of title acquired, dependent upon the mode in which possession is taken.

"Where an entry is made upon an appropriated tract by an intruder, his title is limited to his actual occupancy by residence and cultivation, unless he defines his boundaries; but where the entry is upon a tract of known and designated boundaries by colour of title, the possession is considered co-extensive with the lines by which the tract is designated. An entry is under colour of title when it is made under a purchase from a former claimant by possession, or under a defective title. You will apply these general principles of law to the evidence in this case.

"The evidence shows that Joseph Keffer contracted with Green for the purchase of the 700 acres which Green had purchased as Bartche's property in 1807, and went into possession, the same year, of the tavern tract. Soon after this, according to the evidence of the plaintiffs' witness, a man named Carl went into the house on the Lesher tract, as the tenant of Keffer. Peter Zimmerman says he lived there in the years 1810, 1811, and 1812; and there is evidence of a survey of the Lesher tract at the instance of Keffer in 1810. We do not recollect any other evidence of a tenant upon the Lesher tract until 1815, when Keffer removed himself to the Lesher tract; but there is evidence of Keffer working the saw-mill and sawing lumber prior to 1815.

"Keffer continued on the Lesher tract from 1815 to 1824, and during that time cleared land, and cultivated the cleared land, used the saw-mill, and exercised the ordinary acts of ownership.

[Schall *et al. v.* The Williams Valley Railroad Company.]

" In 1819, the Lesher tract, as defendants allege, was sold by the county commissioners as the property of Keffer, and the title vested in the county commissioners, by deed from the county treasurer, who purchased it.    There is evidence of payment of rent by Keffer to the county commissioners in 1820, 1821, 1825, 1827, and 1828, and of payment of rent by a man named Speadzer to the commissioners, in the years 1825 and 1827. The evidence of plaintiff shows that Speadzer occupied this house for two years—from 1824 to 1826.    From 1826 to 1833, there is a conflict in the evidence as to the occupancy of this Lesher property; the evidence on part of defendants, showing, as they allege, an occupancy during those years by the tenants of the commissioners, or Keffer, who, it is alleged, rented from the commissioners, and Doctor Becker and others, who purchased in 1830 ; while the evidence of the plaintiffs, as they allege, shows a period of some years—between 1827 and 1833—that the possession was abandoned, and no tenant upon the land, or cultivation of the fields.    This is a fact which we refer to you.

" Was the possession continued from 1808 or 1810 to 1833, or even to 1832, without abandonment or interruption by those claiming the land, except short intervals arising from unavoidable or necessary causes, as to the occupancy of the house or cultivation of the land ? or from 1807 or 1808 to 1829? (for some of the witnesses speak of Carl being there as early as 1807 or 1808)— this would give title to defendants, under the statute of limitations, and defeat plaintiffs' recovery, if this were the whole case.    But if the possession was abandoned without unavoidable or necessary cause, arising from difficulty in procuring a tenant for a short. time, or permitting the land to have an occasional rest, this would defeat the defendants' title under the statute.

"But the plaintiffs contend that, even if the defendants' title was perfected by possession up till 1833, the possession was then abandoned, and that the plaintiffs purchased under circumstances that will prevent the defendants using the title they had acquired by their possession prior to 1833, to defeat the plaintiffs' recovery. This position of the plaintiffs arises under the following facts :—A witness named George Daubert says, he moved into the house on the Lesher tract, and lived there about eight years ; that no one lived there when he moved in ; that the house had not been long empty; William Palm lived there before he moved in, and George Bretz and his father lived on the place before Palm ; that there was not more than four acres fenced ; the fences were bad ; that a good deal had been cleared where the fences were burnt ; that he moved there by his own consent ; no one lived there, and no one came to ask taxes or anything ; that Col. Cake came there and asked him how he got there ; and witness told him he went there, no one

living there, and he did not know who owned it; that he found it empty, and moved in on his own hook; that after he had lived on the place three or four years, he took a lease from Col. Cake, and was to pay $1 and the taxes.

" Col. Cake proves that George Daubert was on the land in the fall of 1839; that it then belonged to The Williams Valley Railroad Company, of which Col. Cake was President, and he leased the land to Daubert.

" John Snavely says he bought the land from Samuel Schwartz for $200; that about the time he bought, Daubert was living there, and he thinks, before he bought, he asked Daubert how he came there, and Daubert said he just moved there; that nobody told him, and no one lived in it. The witness further says, that at the time he bought, he had no notice of any adverse title, and no knowledge of any, to the best of his recollection.

" Under these circumstances, the plaintiffs claim to be *bonâ fide* purchasers, without notice, and that they cannot be affected by defendants' title under the statute, even if it had been perfected prior to the plaintiffs' purchase. That by permitting an intruder to enter for a year, or a month, for we do not see how time can vary the principle contended for, the labour and improvements of twenty years may be swept away by an ancient title, which has been dormant for near half a century. To establish such a principle might be productive of great injury.

" But there is a principle of law, based upon the soundest dictates of justice and equity, which we consider applicable to this case. We must consider both parties here *bonâ fide* purchasers for value. Both, doubtless, paid their money for what they considered a good title, and a loss must be sustained by one of the two innocent parties.

" In such cases, the law requires that the party whose negligence, or want of ordinary caution and prudence, has most contributed to the difficulty, shall bear the loss. Which party has acted most imprudently in this case? The defendants, who, after they had acquired a perfect and undoubted title, did not keep, with watchful care, a tenant in their house, to notify all inquirers that they owned the property, and thus keep out intruders who could give no information as to the claimants—or the purchaser, Mr. Snavely, who says he asked Daubert how he got there, and, upon being told that he went there without permission from any one, went away and made the purchase?

" Had Snavely inquired, Daubert could have told him that Palm, a former occupant, had left about six months before Daubert went in, and that George Bretz and his father lived in the house before Palm, for Daubert swears to the facts; and had Snavely examined the premises for evidence of occupancy, he must have discovered unmistakeable marks of former possession,

[Schall *et al. v.* The Williams Valley Railroad Company.]

both ancient and recent, for Daubert says at that time about four acres were under fence, and the fence had been burnt off a part; and Mr. Lewis, who was on the premises last week, says there were old fruit trees around the house, and others apparently about twenty-five years old, which, in 1837, when Snavely purchased, must have been planted but a few years. Under these circumstances, ought a man of ordinary caution and prudence to make further inquiry, and would such inquiry have resulted in ascertaining the nature and extent of the possession prior to Daubert's entry, and under whom it was occupied?

"Should you be of opinion that ordinary prudence and care required further inquiry by Snavely before he purchased, which would have resulted in a knowledge of the plaintiffs' title, then he is not in the position of a purchaser without notice, nor entitled to protection from the consequences of his own rashness and imprudence. We see nothing in the evidence to give the plaintiffs a stronger equity than Snavely. They purchased from him about eighteen months after his purchase from Schwartz, and with the same means of obtaining information that Snavely had.

"Title by the statute of limitations is peculiar in some respects. Although it is as perfect and absolute as a legal conveyance, it is not susceptible of being recorded as a deed. Its record is upon the ground, and in the knowledge and recollection of those living in the vicinity. It would be almost impracticable for a title to be acquired by twenty-one years' actual possession, unless in a very obscure and sparsely settled portion of country, without such occupancy being generally known to those residing in the vicinity of the land; and after a title has been thus acquired, it is not necessary that an unintermitted actual possession should be kept, if the claimant leaves upon the ground unmistakeable marks of recent and long-continued possession, which may be seen and read by all honest and anxious inquirers after the title, and which are sufficient to induce inquiry which would result in ascertaining the truth.

"Even in the case of an unrecorded deed, when the purchaser is guilty of culpable neglect, in not recording his deed and not taking possession, when there is enough known to the second purchaser to put him upon inquiry, this will defeat his title. In Boggs *v.* Varner, 6 *W. & S.* 472, which was the case of an unrecorded deed, Judge ROGERS, in delivering the opinion of the court, says: 'The evidence of notice should be of such a nature as to convince every reasonable and dispassionate mind that the subsequent vendee knew of the existence of a prior and superior title, or that he ought to have known, inasmuch as there was enough known to him *to put him upon inquiry*, which the law deems equivalent to *actual* notice."

"You will then determine whether, in 1837, when this pro-

[Schall *et al. v.* The Williams Valley Railway Company.]

perty was purchased by Snavely, there were such marks of recent and long-continued possession upon the ground as ought to have induced further inquiry by the purchaser. If there were, this, in law, is considered equivalent to actual notice, and would defeat the plaintiffs' recovery, if you believe that, prior to Snavely's purchase, the defendants had perfected their title by the statute of limitations.

" On the contrary, if you are not satisfied that Snavely acted rashly and imprudently, in purchasing without further inquiry in reference to the occupancy and title of this property, under all the circumstances of this case, but his conduct was that of a man of ordinary prudence and caution, and the defendants are the more culpable party, in permitting an intruder to enter upon their land, then the plaintiffs would be in the position of purchasers without notice, and their title would be superior to the defendants'."

To this charge the defendants excepted; and a verdict and judgment having been rendered for the plaintiffs, the defendants removed the cause to this court, and here assigned the same for error. The following opinion was delivered in the court below, on a motion for a new trial, by GRAHAM, P. J. :—

" The defendants ask for a new trial on the ground of misdirection by the court to the jury, and because the verdict is contrary to the evidence. The legal question presented is upon the nature of the title acquired under the statute of limitations. The defendants contend that when perfected by twenty-one years' possession, and that nothing short of twenty-one years' adverse possession will defeat it.

" The question presented in this case, is novel, and is worthy of careful examination. On the trial, we submitted the question of negligence, to the jury. That it was a question of loss between two innocent parties, and the law required that the party whose negligence or want of ordinary caution and prudence has most contributed to the difficulty, should bear the loss. We submitted to them to find whether the defendants, by negligence to keep up their notice of title by possession for seven or eight years, and permitted George Daubert, an intruder, to enter upon and occupy the premises, who had no claim of title, and could give no notice of claim to the purchaser of the legal title, under a warrant, survey, and patent from the Commonwealth; or Mr. Snavely the purchaser, by omitting to make further inquiry of Daubert and others, with the evidence which the premises afforded of long-continued and recent possession—had been guilty of the greater negligence. Of this instruction the defendants complain, and that we did not give to the jury a positive direction, that if the title of defendants was perfected by twenty-one years' possession, prior to Daubert's entry, the defendants were entitled to their verdict.

[Schall *et al. v.* The Williams Valley Railroad Company.]

"After a more careful examination of the law, applicable to this case, than we had an opportunity of making during the progress of the trial, we think if there was an error committed, it was in favour of and not against the defendants.

"It is conceded, that title acquired under the statute of limitations, is as valid and effectual as title acquired in any other mode; but it must also be conceded, that such title has no greater validity or sanctity than any other legal title. We cannot therefore conjecture any reason why such negligence as would destroy a good legal title acquired in one mode, should not destroy a similar title acquired in another mode, in favour of a *bonâ fide* purchaser for value. It is not the validity of the respective titles of the parties that is the subject of controversy. We may assume, either would be good in the absence of the other; but when they come in conflict, which shall prevail? If one party, by negligence, has permitted another to acquire a title perfectly good upon its face, without affording him the means of notice of a superior title, such neglect, by reason of the injury which would be inflicted upon the purchaser, will enable him to recover against a title which would have been conclusive against his grantors. Thus a second purchaser will prevail against an older and better title held by unrecorded deed, and this by reason of the neglect to give notice, such as the law requires of the older title. But possession by the first purchaser, is notice when the deed is not recorded. A purchaser who holds by deed, has two ways of protecting his title—by possession or recording his deed. A claimant under the statute has but one mode of giving notice—that of possession. He has no deed to record; but because he has but one mode and not two, as the purchaser by deed has, is he to be excused from giving notice by continued possession, and to be permitted to let an intruder enter and occupy for six or seven years, who can give no information to an inquirer who is about to purchase a title by warrant, survey, and patent?

"It is true, cases may be imagined, where the rule of continued possession, after title acquired under the statute, to protect against title by patent from the Commonwealth, might operate harshly, as the case put by counsel, where the land had become valuable by labour, clearing, and improvements of twenty-one years. The owner may live a distance, and occupy by his tenant. The tenant moves unexpectedly, without notice to his landlord—an intruder enters who has no knowledge of any title or claimant, and a speculator, after inquiry of the person in possession, buys up a good legal title, before the proper owner has any knowledge of the removal of his tenant. This is putting an extreme case, and extreme cases are not always the best way of illustrating the correctness of general principles. Were we to attempt to bend and accommodate legal rules to meet the real or supposed hard-

[Schall *et al. v.* The Williams Valley Railroad Company.]

ship of each particular case, the only tenure by which we would hold our acquisitions would be prescribed by the opinions of the judges, for the time being, impossible to be known until delivered, in place of a symmetrical system of principles and rules, built up by the labours of the learned through a series of ages.'

"But a fair set-off to this argument is the case propounded by plaintiffs' counsel. An honest labourer builds his cabin and clears a potato patch on an appropriated tract, and claims to the extent of the survey; the land is mountainous, sterile, and unproductive, and in place of attempting to clear and cultivate a farm, and erect comfortable buildings, he wisely concludes to erect a little saw-mill, and by sawing the sparsely scattered timber upon the sterile soil, which has only afforded sufficient nourishment to raise an occasional sapling to the dignity of a saw-log, he succeeds in filling the mouths and partially covering the backs of his wife and children for twenty-one years. But the timber is exhausted; the saw-mill becomes useless, and starvation is at his door. He sells his title—or the sheriff sells it for him—for a mere trifle, to a speculator, who shrewdly conjectures there is more value under than upon the surface. The purchaser has a perfectly legal and indefeasible title, which can only be lost by adverse possession for twenty-one years, say the counsel for the defendants, and he therefore wisely determines to abandon the trouble of keeping the cabin tenanted, which is too dilapidated to be occupied and rented to keep up the possession, to be replaced by a new one. This useless expenditure he avoids by permitting it to go to decay, which he may safely do, if the argument of defendants' counsel is sound, that his title is perfect and cannot be impaired for twenty-one years. He lives in Pottsville or Philadelphia, and pays his taxes promptly, as most speculators are careful to do; and this, he is advised, is all that is required to protect his title from the cormorant maws of his brother speculators. Eighteen years roll around; his neighbour hears of untold millions realized by investments in Schuylkill county coal lands; a title, perfect on its face, is offered to him; although eager and anxious, he is cautious and prudent; he procures a surveyor, goes upon the ground and discovers the land; careful examination is made, to ascertain if the title which he is about to purchase has been impaired by possession. But the cabin and fences have mouldered away, the saw-mill disappeared, and the cleared land is covered with timber, the growth of eighteen years. No vestige of the marks of previous occupancy can be discovered. He makes the purchase, builds his railroad, sinks his shaft, erects his engine, expends every dollar of his means upon this mine of untold wealth, and just as he is about to realize a return for his expenditures, his neighbour brings an ejectment upon the title of the former occupant, long since obliterated from notice, and must necessarily recover, if the posi-

tion assumed by defendants' counsel is tenable ; that a title once acquired under the statute can only be defeated by twenty-one years' adverse possession. These illustrations we think sufficient to dispose of the argument attempted to be drawn from the hardship of extreme cases on either side. If established and known legal principles are to be modified to meet extreme cases, it is time enough to commence the dangerous work when cases arise requiring such remedy. We do not consider the present case requires a departure from or modification of settled rules of property. Both parties doubtless purchased honestly, believing they obtained good title, and we are willing to place them in a position in which they have placed each other—of speculators buying a very valuable tract of coal land for a very small consideration. Neither party has contributed by labour or expenditures, to increase its value. Their merits are equal, and the land must be given to the party to whom the law gives the better title. In Woods *v.* Farmere, 7 *Watts* 384, Chief Justice GIBSON says, that possession of a tenant is notice of his actual interest, whether as a lessee or purchaser, ' and where the occupant has not an opportunity to register his deed, or a deed to register, nothing short of it could protect him.' The possession of an intruder is therefore no notice of the title of any one ; and that a title of which no notice is given either by registry or possession, is valueless against a subsequent purchaser, is ruled in many cases.

" In Boggs *v.* Varner, 6 *W. & S.* 469, Boggs held by an unrecorded deed, a house and lot in Pittsburgh. He and those claiming under him occupied the house for many years. Varner lived on what was formerly part of the same lot, and was in habits of daily intercourse with the family of Boggs. In 1825, the house was burned, and the house was unoccupied until 1828, when Varner purchased the same title under which Boggs held by unrecorded deed. And in the chain of title by which Varner held the adjoining lot, the lot of Boggs was referred to as adjoining. Under this circumstance, although Varner had express knowledge of Boggs occupying the lot until the house was consumed by fire, a recovery by Boggs on his unrecorded deed was defeated.

" The case of Wright *v.* Wood, 11 *Harris* 130, is to the same effect. The defendant claimed under an unrecorded deed from Jane Vanschuyver. The plaintiff under a deed from the heirs at law of the defendant's grantor. The land was occupied for many years by those claiming under the unrecorded deed. The Vanschuyvers had not been in possession from 1821 till their conveyance to Wood, the plaintiff, in 1847, a period of twenty-six years. The administrators of Wright, who held under the unrecorded deed, sold to Osmond by order of the Orphans' Court, which was confirmed in March 1838. Osmond took possession 1st April 1838, paid $1000, and continued in possession until 31st March 1842.

[Schall *et al. v.* The Williams Valley Railroad Company.]

In consequence of some difficulty between Osmond's and Wright's administrators, Osmond refused to comply with his contract, and removed from the premises. On the 1st April 1842, Hellings took possession, without leave from any one, as an intruder, and remained till March 1847. The heirs of Jane Vanschuyver conveyed to Wood, in December 1846 and January 1847, and upon this conveyance Wood recovered against those claiming under the unrecorded deed, and possessing under it for twenty-six years. It appeared, also, that Hellings, the intruder, before he took possession, applied to the administrators of Wright for permission to do so, and was referred by them to Osmond. From this the inference would be irresistible, that Hellings had a knowledge of the difficulty between Wright's administrators and Osmond, the purchaser, and that proper inquiry by Wood of Helllings, the occupant, would have developed a full knowledge of the title under the unrecorded deed. But, in answer to this, the court say: 'The possession of one, either in person or by his tenant, is notice of his unrecorded title; but the possession of an intruder cannot be held to be notice of the title of a stranger. The evidence was clear that the possession of Hellings had no connection whatever with the title under which defendant claimed. It is barely possible that an inquiry of Hellings would have elicited some information in regard to the claim of Wright. A mere possibility will not suffice to obviate a difficulty occasioned by the neglect to comply with the recording acts.'

"The cases we have cited, clearly establish the principle that occupancy by the claimant or his tenant is notice of his title, but the occupancy of an intruder, with or without inquiry of him, is no notice. A purchaser is not required to make inquiry of the occupant, but then he purchases at his peril, and takes it with notice of the title under which the occupant holds. If he holds under an unrecorded deed, the purchaser is affected with notice. If the occupant enters and holds as an intruder, the purchaser takes a title, paramount to any title of which he has no means of obtaining notice. If we are correct, the defendants cannot complain. The instruction to the jury was more favourable to them then the law justified, in submitting whether the plaintiffs or defendants were more culpable,—the former in not making further inquiry, or the latter, in permitting an intruder to occupy, for six or seven years, when possession was the only notice of title they could give. Snavely did more than the law required, in inquiring of Daubert, the occupant, how he held the premises. He would, under the circumstances, have been protected without any such inquiry. Col. Cake and others, in their purchase from Snavely, in September 1838, are also purchasers without notice, for Daubert was still in possession as an intruder, and took a lease from Col. Cake in the fall of 1839. If notice of title is required

[Schall *et al. v.* The Williams Valley Railroad Company.]

when it can be given, the law and the weight of evidence is with the plaintiffs. And why a title under the statute of limitations should not require possession to protect it equally with an unrecorded deed, we can discover no reason. Suppose an unregistered deed is lost or destroyed, can it be that, because the claimant has but one way of giving notice, and not two, he will be excused from taking and continuing possession to protect his title from subsequent purchasers? The law abhors secret trusts and titles, and will not sustain them to the prejudice of the innocent, who would thereby be subjected to loss by the negligence of a party who has omitted to give such notice as the nature of his title will permit.

"Should it be contended, that this case is different from the cases cited of a subsequent purchaser against a prior unrecorded deed, when both claim through the same title, because in the present case, the parties claim through separate and distinct titles, the answer is that such distinction does not exist. To acquire title under the statute, title must be shown out of the Commonwealth. Without showing title in some one, the defendants have no case. But title is shown in John Lesher, the warrantee, by warrant and survey and patent to Ludwig Schwartz, the vendee of Lesher, in 1803. Both parties therefore necessarily claim through Lesher and Schwartz. If the defendants claimed by unrecorded deed from Lesher or Schwartz, the subsequent deed to Snavely must defeat their title. Why, if the law requires them to keep up notice of a title by deed, shall they be permitted to abandon their evidence of title by possession, the moment such title is required? A purchaser cannot put his deed in his desk and remain passive for twenty-one years, and protect his title by the payment of taxes alone. And we can recur to no principle of law or equity, that permits all notice of title to be obliterated and abandoned, and then such title to be reasserted at the expiration of any period short of twenty-one years, against a *bonâ fide* purchaser for value, without notice, or the means of obtaining it. For the reasons stated, we think the verdict is in accordance with the law and evidence of the case, and we will not disturb it.

"The motion for a *new trial* is overruled, and judgment entered upon the verdict."

*Bannan* and *Tower*, for the plaintiffs in error.—A title by the statute of limitations is as perfect as though the possessor of it had a deed on record; and cannot be lost by a mere neglect to keep up the possession: Atkyns *v.* Horde, 1 *Burr.* 119; Stokes *v.* Berry, 2 *Salk.* 421; Johnston *v.* Irwin, 3 *S. & R.* 291, 294; Pederick *v.* Searle, 5 *Id.* 236; Black *v.* Moore, 1 *Barr* 344; Graffius *v.* Tottenham, 1 *W. & S.* 488; Mercer *v.* Watson, 1 *Watts* 339; Criswell *v.* Altemus, 7 *Id.* 580; Gregg *v.* Blackmore, 10 *Id.* 192; Leeds *v.* Bender, 6 *W. & S.* 315; Fitch *v.* Mann, 8 *Barr*

[Schall *et al. v.* The Williams Valley Railroad Company.]

507; Hinman *v.* Cranmer, 9 *Id.* 40; Sailor *v.* Hertzogg, 10 *Id.* 316; Green *v.* Kellum, 11 *Harris* 258; Sailor *v.* Hertzogg, 2 *Barr* 184; Bunting *v.* Young, 5 *W. & S.* 194, 196; Urket *v.* Coryell, *Id.* 60, 83; Watson *v.* Gilday, 11 *S. & R.* 337, 341; Cox *v.* Cromwell, 3 *Binn.* 114, 119; Moore *v.* Luce, 5 *Casey* 262.

*F. W. & J. Hughes* and *Hoffman,* for the defendants in error. —A title by the statute of limitations is not more indefeasible than one by actual grant, and the possessor of it may be estopped from setting it up against a *bonâ fide* purchaser for value, without notice: *Story's Equity Jur.,* §§ 108, 387, 389, 411.     The facts of this case raise the question of an estoppel by acts *in pais:* Woods *v.* Farmere, 7 *Watts* 384; Billington *v.* Welsh, 5 *Binn.* 131; Grier *v.* Sampson, 3 *Casey* 191; Beaupland *v.* McKeen, 4 *Id.* 131; Commonwealth *v.* Moltz, 10 *Barr* 527; Carr *v.* Wallace, 7 *Watts* 400; McKelvey *v.* Truby, 4 *W. & S.* 326.

The opinion of the court was delivered by

WOODWARD, J.—All the material facts of this case lie within a narrow compass.   The plaintiffs showed a perfect paper title to the land in controversy, from John Lesher, the original warrantee of the Commonwealth.   Deriving their title through Schwartz and Snavely, they showed that when the latter purchased there was no inconsistent title on record, and no possession to give notice of an adverse right.   Daubert, who was on the ground at the time, was a mere intruder, and claimed under neither title that is in question here.   The plaintiffs claimed, therefore, to be *bonâ fide* purchasers, without notice of the title of the defendants.

The defendants claimed under the statute of limitations.   They showed a possession commenced in 1805, and continued down to about 1833, when the tenants of the then owners deserted the premises, and George Daubert entered as an intruder.   This title, transferred several times, and twice by public sales, was duly vested in the defendants.   As the case is presented on the record, we are obliged to consider every fact necessary to complete a title under the statute, so proved, that the jury would have found it had it been submitted.   In other words, we assume that the plaintiffs have a perfect paper title, and the defendants a perfect title under the statute of limitations—but that when Snavely bought the title under which the plaintiffs claim, the defendants had lost the possession, though the statutory period of twenty-one years had run out in favour of their right long before.

The learned judge declined to affirm the main position assumed by the defendants, that a title once perfected by twenty-one years' possession, cannot be lost by neglecting to keep up the possession after that period, and that nothing short of twenty-one years' adverse possession will bar it.

[Schall *et al. v.* The Williams Valley Railroad Company.]

An unrecorded paper title does not affect a purchaser without actual notice, and the learned judge pronounced a title by the statute of limitations, if unaccompanied by a continued possession, as no more than an unrecorded paper title. If this be sound doctrine, then the claimant under the statute, however he may have perfected his right, must keep his flag flying for ever, and the statute ceases to be a statute of *limitations*.

The first observation we have to make on this ruling is, that titles matured under the statute of limitations, are not within the recording acts. However expedient it might be to require some public record of such titles to be kept, and however inconvenient it may be to purchasers to ascertain what titles of that sort are outstanding, still we have not as yet any legislation on the subject, and it is not competent for judicial decision to force upon them consequences drawn from the recording acts. Those acts relate exclusively to written titles. Possessory titles have always been favourites of Pennsylvania legislation, and it would ill become the judiciary to clog them with conditions and disabilities, which the law-making power has not prescribed, nor even suggested.

Our next remark is, that the ruling below mistook the true nature of titles under the statute of limitations. The elements of all titles to land are possession, the right of possession, and the right of property, which Blackstone denominates the *jus merum*. The instance he puts to illustrate both the absolute right of possession and the mere right of property, is that of a person disseised, or turned out of the possession of his estate, neglecting to pursue his remedy within the time limited by law. The disseisor in such case unites the absolute right of possession with the actual possession, leaving to the disseisee the mere right of property, which is for all practical purposes a barren sceptre.

In the great case of Atkyns *v.* Horde, 1 *Burr.* 119, Lord MANSFIELD expounded the effect of the statute of limitations in these words:—"Twenty years' adverse possession is a *positive* title to the defendant; it is not a bar to the action, or remedy of the plaintiff only, but takes away his right of possession. Every plaintiff in ejectment must show a right of possession as well as of property, and therefore the defendant need not plead the statute as in the case of actions."

In Stokes *v.* Berry, 2 *Salk.* 421, this positive title was held not only sufficient to support a defence, but one upon which a plaintiff may recover in ejectment; a decision which Judge TILGHMAN followed, in Pederick *v.* Searle, 5 *S. & R.* 240, where he declared that the right of possession is *acquired* by twenty-one years' possession.

If, according to Lord MANSFIELD, the right of possession is taken away from the former owner, and according to Chief Justice

[Schall *et al. v.* The Williams Valley Railroad Company.]

TILGHMAN, it is acquired by the disseisor's occupancy for the statutory period, Judge GIBSON was strictly accurate when he said, in Graffius *v.* Tottenham, 1 *W. & S.* 494, that the effect of the statute was to transfer to the adverse occupant the title against which it has run.   He added, " the title of the original owner is unaffected and untrammelled till the last moment, and when it is vested in the adverse occupant, by the completion of the statutory bar, the transfer has relation to nothing which preceded it; the instant of conception is the instant of birth."

The common law distinction between the right of possession and the right of property, as elements of title, is very much disregarded by us, and, so far as concerns the operation of the statute of limitations, is altogether lost sight of.   Hence, we have numerous cases in our books in which titles, under the statute, are spoken of as titles against all the world—as indefeasible—as equally perfect with any known to the law—as title against the true owner—as capable of being lost only by grant or adverse possession, and not by neglect—as a perfect title even against a *bonâ fide* purchaser, without notice, &c.: Leeds *v.* Bender, 6 *W. & S.* 318; Gregg *v.* Blackmore, 10 *Watts* 192; Criswell *v.* Altemus, 7 *Watts* 580; Mercer *v.* Watson, 1 *Watts* 339; Cooper *v.* Smith, 9 *S. & R.* 26; Porter *v.* McGinnis, 1 *Barr* 413; Dikeman *v.* Parrish, 6 *Barr* 210; Sailor *v.* Hertzogg, 2 *Barr* 184; Bunting *v.* Young, 5 *W. & S.* 196; Urket *v.* Coryell, *Id.* 60; Greene *v.* Kellum, 11 *Harris* 258; Moore *v.* Luce, 5 *Casey* 262; Heckerman *v.* Hummel, 7 *Harris* 69.

If the operation of the statute be such as these cases teach— if it takes away the title of the real owner, and transfers it, not in form, indeed, but in legal effect to the adverse occupier, is it not manifest that when Snavely bought the recorded title of Schwartz, in 1837, he bought a title which, by operation of law, was fairly vested in these defendants?   Whatever merit that title possessed, by reason of being on record, must be regarded as belonging to the defendants.   In a word, whatever title was outstanding from the Commonwealth to this land, they had acquired, and had acquired it, too, under a statute which gave them no facilities, and laid upon them no obligation to make a record of it.   This view of the effect of the statute verifies Judge HUSTON's words in Leeds *v.* Bender, that " it gives as perfect a title, if not a more perfect title, than any other known to our law." . That experienced judge told us, in the same case, that he had attended to the operation of the statute almost half a century, and that he did not know any more beneficial, and in its general operation, more just law.

But when Snavely bought, he had no notice that the title he was purchasing had been transferred to the defendants, and it is argued that secret titles and liens are to be discouraged.   Un-

[Schall, *et al. v.* The Williams Valley Railroad Company.]

doubtedly. Yet how can the title of the defendants be regarded as secret? It had come down through two public sales that were on record, and it was proclaimed by whatever marks on the ground a possession of nearly thirty years had left there. There were, besides, the traditions of the neighbourhood, anciently the only legal evidence of transfers of land, to guide a diligent inquirer to the truth. If these were insufficient circumstances to affect a purchaser with notice, then it must be remembered, that a title under the statute cannot be spread upon the registry of deeds. The law has created the title, but has provided no way for recording it. Shall the law, for that reason, destroy it? This would be to charge the law with folly.

So long as we retain this statute, and hold it in so high esteem, conveyancers and purchasers should not content themselves with merely searching registries, which were an invention consequent upon written titles, but they should make themselves familiar with the history of the possession for the last one-and-twenty years, at least. And if they would be relieved of this necessity, they must get the legislature to contrive a mode of putting this kind of title on the public records. 'Till that is done, the courts will be obliged to give effect to such titles without regard to records.

The plaintiffs have attempted to avail themselves of the equitable principle, that one standing by, and seeing another purchase an apparent title without disclosing his own superior right, shall be estopped from setting it up to the prejudice of the purchaser; but we do not see any facts upon the record which call for the application of this principle. The defendants' title having matured long before the plaintiffs purchased theirs, the defendants were under no more obligation to keep up the possession than any other owner is to occupy what he owns.

We think the court erred in submitting the case to the jury as a question of negligence, and that they should have affirmed the defendants' proposition, that a title perfected under the statute of limitations is not lost, by neglecting to keep up the possession.

> The judgment is reversed, and a *venire facias de novo* is awarded.